1999 SD 117

**Mike SIMPSON, individually and d/b/a Delta Enterprises, Plaintiff and Appellant,**

v.

**C & R SUPPLY, INC., a South Dakota Corporation, and C & R Supply, Inc., d/b/a A & M Industries, Defendant and Appellee.**

**Nos. 20427, 20451.**

Supreme Court of South Dakota.

Argued Dec. 3, 1998

Decided Aug. 25, 1999.

Gale Fisher, Sioux Falls, for plaintiff and appellant.

Thomas J. Welk, Lisa Hansen Marso, of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellee.

KONENKAMP, Justice.

[¶1.] Mike Simpson appeals a grant of summary judgment in favor of C & R Supply. We affirm in part, reverse in part, and remand.

### Facts

[¶2.] In 1970, Mike Simpson began Delta Enterprises. Delta acted as a manufacturer's sales representative for companies making component parts for agricultural sprayers and other farm equipment. It took orders from customers and forwarded those orders directly to the manufacturers. In 1971, Simpson and an associate, Arlan Maranell, formed a separate company, A & M Industries, Inc., to sell molded fittings, strainers, valves and other plastic parts. A & M differed from Delta in that it had a product inventory in storage. A & M was not a retail outlet, however; it sold its products to distributors and manufacturers. Maranell oversaw A & M's operations, while Simpson continued doing business as Delta. A & M grew to become a highly successful business, with customers across the United States. It bought molds for use in producing some of its plastic fittings and parts, and sent them to a company specializing in custom injection molding, a process by which plastic molds are used to create duplicate parts and fittings.

[¶ 3.] Clay Moyer owned C & R Supply, Inc., a company that sold products to farmers and retail customers. C & R's product line included items similar to those sold by A & M and the companies Delta represented. It was a customer of Delta and A & M. Both companies supplied parts and fittings to C & R for assembling the field sprayers that it sold to other customers. C & R never manufactured its own components.

[¶ 4.] In August 1989, Simpson and Moyer discussed the sale of A & M to C & R. Moyer wanted to expand C & R by acquiring A & M's business. Eventually, the parties agreed on a price. To take advantage of certain federal tax benefits, the parties agreed that $160,000 of the purchase amount would be allocated to a non-competition agreement ("agreement" or "covenant"). Simpson and Maranell would each receive from Moyer $20,000 per year for four years, subject to the terms of the noncompetition agreement. It provided in relevant part:

NOW, THEREFORE, in consideration of the premises set forth above and mutual promises herein made, the parties hereto agree as follows:

1. *Non–Competition.* Simpson covenants and agrees that for a period of four (4) years from and after the closing date specified in the Asset Purchase Agreement he shall not, directly or indirectly:

(a) in any manner induce, attempt to induce, or assist others to induce or attempt to induce any employee, independent contractor or customer of C & R or the Business to terminate its, his, or her association with C & R or the Business, or do anything to interfere with the relationship between C & R or the Business and such person or entity or other persons or entities dealing with C & R or the Business;

(b) own, manage, operate, control, be employed by, work for, consult with or for, participate in, or be connected in any manner with the owner-

ship, management, operation or control of any business competitive with the Business:

(i) within a radius of twenty-five (25) miles of Sioux Falls, South Dakota;

(ii) within a radius of two hundred fifty (250) miles of Sioux Falls, South Dakota;

(iii) within all counties within any of the United States of America.

In the recitals of the agreement, the parties were defined as follows:

Simpson is a principal owner and employee of A & M Industries, Inc., a South Dakota corporation ("A & M"), which is principally engaged in the business of developing, manufacturing, distributing and selling various plastic products and molds and nylon fittings (the "Business"). A & M has entered into an Asset Purchase Agreement dated August 24th, 1989 (the "Asset Purchase Agreement") with C & R. Pursuant to the Asset Purchase Agreement, C & R will acquire substantially all of the operating assets of the Business owned by A & M. The execution and delivery of this Agreement by Simpson is a specific condition precedent to C & R's obligations under the Asset Purchase Agreement.

After the sale, A & M operated as a "sister company" or subsidiary of C & R. The two had separate accounting systems, which were combined at the end of the year for tax purposes. As part of the sale, Maranell was given a "management position" with the two companies.

[¶ 5.] Sometime between late 1989 and early 1991, C & R moved into the custom molding business and acquired injection molding machines. It began making nylon fittings for its inventory. In October 1991, A & M started manufacturing its own parts, as well. Maranell was placed in charge of the custom injection molding operations at A & M. A & M landed the Power Sentry account shortly after it purchased the injection molding machines. Power Sentry gave C & R its moldings and A & M manufactured the components.

Power Sentry became A & M's largest account with product sales of over $93,000 from January to April 1992.

[¶ 6.] In February 1992, Maranell ended his employment with C & R and A & M. Afterwards, a representative of Power Sentry approached Maranell to say that the company was not happy with A & M's handling of its account, that production had dropped, and that Power Sentry wondered if Maranell could "help [them] out." Power Sentry wanted to take its molds away from A & M, but could not do so, as it owed A & M money. Maranell loaned Power Sentry $30,000 to help pay its debt to A & M. In March 1992, Maranell and Simpson started Custom Plastics, Inc., located near Tea, South Dakota. By May 1992, Custom Plastics was manufacturing components for Power Sentry. Between May and October 1992, Power Sentry was Custom Plastics' only customer.

[¶ 7.] Under the noncompetition covenant, Moyer made the annual $20,000 payments to Simpson and Maranell in both 1990 and 1991. In 1992, however, Moyer paid Maranell, but refused to pay Simpson. He paid neither Simpson nor Maranell in 1993.[1] Simpson sued C & R in November 1995. On February 24, 1997, C & R moved to dismiss for failure to prosecute under SDCL 15–11–11. After a hearing on March 25, 1997, the circuit court denied C & R's motion. The court found that the one-year period had just run, no one was prejudiced by the delay, and the case was ready for trial. In addition, the court noted that the statute of limitations had not run on the cause of action; thus, the suit could be reinitiated the next day. Finally, the judge commented that this Court might find an abuse of discretion if the case were dismissed.

[¶ 8.] After a series of intermediate orders, the circuit court concluded that Simpson had breached the noncompetition agreement, granted summary judgment dismissing Simpson's complaint, and ordered him to pay back to C & R the $40,000 it previously paid him for the covenant not to compete. Simpson had contended, nonetheless, that he and Moyer had an oral understanding that he could continue business with Delta Enterprises without violating the agreement. The court ruled that because their written agreement was unambiguous, parol evidence was inadmissible to vary the terms of the noncompetition provisions.

[¶ 9.] Simpson appeals the granting of summary judgment and, by notice of review, C & R appeals the trial court's refusal to grant its motion to dismiss for failure to prosecute under § 15–11–11. The parties present the following issues: (1) Whether the trial court abused its discretion when it denied C & R Supply's motion to dismiss for failure to prosecute under § 15–11–11.(2) Whether the covenant not to compete was valid under SDCL 53–9–9.(3) If the covenant was invalid as written, whether it would be valid if modified to conform to the statute. (4) If valid as modified, whether the covenant was breached. (5) Whether the alleged conversations between Simpson and Moyer are admissible to modify the terms of the noncompetition covenant.[2]

### Standard of Review

■ [¶ 10.] On motions to dismiss for failure to prosecute we review trial court decisions under the abuse of discretion standard. *Schwartzle v. Austin Co.*, 429 N.W.2d 69, 71 (S.D.1988); *see Duncan v. Pennington County Hous. Auth.*, 382 N.W.2d 425, 427 (S.D.1986). In reviewing rulings on summary judgment motions our standard was reiterated in *Estate of Shuck v. Perkins County*:

Summary judgment is authorized "if the pleadings, depositions, answers to inter-

---

1. Maranell brought a separate action to obtain the payments owed to him. In that case the circuit court denied recovery, ruling that he directly violated the noncompetition agreement with his participation in Custom Plastics. He did not appeal.

2. This issue lacks sufficient merit for full discussion. We conclude the circuit court properly applied the parol evidence rule. Additionally, the agreement contained an integration clause excluding any outside oral understandings. *See* SDCL 53–8–5.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987). All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990). The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). 1998 SD 32, ¶ 6, 577 N.W.2d 584, 586 (citations omitted). When examining "a grant of summary judgment, we are not bound by the trial court's factual findings, but rather must undertake an independent review of the record." *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 7, 580 N.W.2d 606, 609 (citing *Walz v. Fireman's Fund Ins. Co.*, 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70).

### Analysis and Decision

### 1. Motion to Dismiss for Failure to Prosecute

[¶ 11.] C & R Supply asserts an abuse of discretion when the circuit court refused to dismiss for failure to prosecute under § 15-11-11.

The court may dismiss any civil case for want of prosecution upon written notice to counsel of record where the record reflects that there has been no activity for one year, unless good cause is shown to the contrary. The term "record," for purposes of establishing good cause, shall include, but not by way of limitation, settlement negotiations between the parties or their counsel, formal or informal discovery proceedings, the exchange of any pleadings, and written evidence of agreements between the parties or counsel which justifiably result in delays in prosecution.

SDCL 15-11-11. Plaintiffs bear the duty to advance their cases and defendants need only meet plaintiffs "step by step." *Du-Al Mfg. Co. v. Sioux Falls Constr. Co.*, 444 N.W.2d 55, 56 (S.D.1989)(citing *Potts v. Starr*, 76 S.D. 91, 72 N.W.2d 924, 925 (S.D.1955)); *Holmoe v. Reuss*, 403 N.W.2d 30, 31 (S.D.1987)(quoting *Fox v. Perpetual Nat'l Life Ins. Co.*, 273 N.W.2d 166, 168 (S.D.1978)). Yet we have often stated that trial courts should take an active role in monitoring their dockets. *Annett v. American Honda*, 1996 SD 58, ¶ 31, 548 N.W.2d 798, 805; *Duncan*, 382 N.W.2d at 426-27; *Chicago & N.W. Ry. Co. v. Bradbury*, 80 S.D. 610, 129 N.W.2d 540, 542 (S.D.1964). The goal of the courts is justice—docket control and calendar clearance are secondary concerns. *Bradbury*, 129 N.W.2d at 542.

[¶ 12.] As the case had been pending with no action for over one year, the circuit court could have dismissed it. But an abuse of discretion requires more than failure to dismiss on a facial showing that the limits of the statute have been transgressed. Dismissal is an extreme remedy to be used cautiously. *Duncan*, 382 N.W.2d at 426-27. The "mere passage of time" is not the touchstone for assessing motions to dismiss for failure to prosecute. *Schwartzle*, 429 N.W.2d at 71. If § 15-11-11 really confers discretion, then dismissal is never mandated because a case was idle for a year. True, the delay in this case was unexplained and lack of diligence was the apparent reason. *See, e.g., Bradbury*, 129 N.W.2d at 542 (noting that dismissal should be exercised only in case of unexplained delay in prosecution). But it is for the trial court, not us, to decide whether to dismiss. There were legitimate reasons not to dismiss.[3] The trial court noted that,

---

3. The trial judge also mentioned a concern about being reversed if she dismissed the case. Fear of reversal alone is no basis for ruling and if it were the court's only reason it would itself be an abuse of discretion. Here,

if it granted C & R's motion, the suit could be re-filed, as the statute of limitations had not yet run. Further, the court reasoned that this was a "close" case, as, at the time of the motion to dismiss, the term of inactivity was just over one year. "[T]here is no absolute right to dismissal for a plaintiff's failure to prosecute." *London v. Adams*, 1998 SD 41, ¶ 13, 578 N.W.2d 145, 149. The trial court, moreover, asked whether C & R would suffer prejudice if the case were to proceed. The only prejudice C & R's counsel could suggest was that the client would be forced to litigate the suit and pay attorney fees. If we reversed and ordered a dismissal of Simpson's claim, the dismissal would be final, as the statute of limitations has run. Thus, a reversal now would exact a harsher result than if the circuit court had dismissed the case before the limitations period had expired. We find no abuse of discretion in the denial of C & R's motion to dismiss.

## 2. Validity of Covenant Not to Compete

[¶ 13.] Under South Dakota law, contracts interfering with trade are invalid, subject to limited exceptions. *See* SDCL 53–9–8.[4] One exception is found in SDCL 53–9–9.[5] As it existed at the time the contract was signed, August 1989, the statute provided:

> One who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or part thereof, so long as the buyer or person deriving title to the good will from him carries on a like business therein.

SDCL 53–9–9 (Michie 1990). The statute allowed parties to limit future business transactions and opportunities, as long as their agreements met the mandated geographical limitations.

[¶ 14.] C & R argues that the noncompetition agreement is enforceable because it satisfies § 53–9–9 in three ways: (1) there was adequate consideration given for the covenant; (2) an actual sale of good will occurred; and (3) the covenant abided by the statutory limitations. Although we agree that adequate consideration was given and that this transaction was a sale of good will, we fail to see how the covenant meets the statutory geographical limitations. It states that Simpson must refrain from being involved in business endeavors competing with "the Business: within a radius of twenty-five (25) miles of Sioux Falls, South Dakota; . . . within a radius of two hundred fifty (250) miles of Sioux Falls, South Dakota; and . . . within all counties within any of the United States of America." This provision obviously violates the statute, as it gives no specific "county, city, or part thereof" in which Simpson was to refrain from operating. One clause prohibits Simpson from competing within a radius of twenty-five miles of Sioux Falls, but that radius extends beyond the city limits. To add to the confusion, Sioux Falls lies within two counties, Lincoln and Minnehaha. The clause that restricts Simpson from operating in any county in the United States is overbroad and plainly violates both §§ 53–9–8 and 53–9–9 (pre-amendment). *See American Rim & Brake, Inc. v. Zoellner*, 382 N.W.2d 421, 424 (S.D.1986)(noting that SDCL 53–9–8 voids contracts that restrain trade as a matter of public policy); *Ward*, 1998 SD 10, ¶¶ 15–16, 575 N.W.2d at 238–39 (noncompetition in worldwide "market territory" overbroad under pre-amendment version of § 53–9–9).

[¶ 15.] C & R contends the expression "or part thereof" from § 53–9–9 allows geographical boundaries to be judicially extended a reasonable distance. In our

---

however, the record shows the judge considered other legitimate circumstances.

**4.** SDCL 53–9–8 states: "Every contract restraining exercise of a lawful profession, trade, or business is void to that extent, ex-

cept as provided by §§ 53–9–9 to 53–9–11, inclusive."

**5.** SDCL 53–9–9 was amended in 1997. *See Ward v. Midcom, Inc.*, 1998 SD 10, ¶ 11 n. 6, 575 N.W.2d 233, 236–37 n. 6.

view, this phrase diminishes, rather than extends, boundaries. When examining unambiguous enactments, we have long followed the principle that "statutes mean what they say and that the legislators have said what they meant." *Mid–Century Ins. Co. v. Lyon*, 1997 SD 50, ¶ 9, 562 N.W.2d 888, 891 (quoting *In re Famous Brands, Inc.*, 347 N.W.2d 882, 885 (S.D.1984)). Consequently, we find as a matter of law that the noncompetition agreement is invalid as written.

### 3. Modification of Covenant to Conform to the Statute

[¶ 16.] In the past, this Court has modified other noncompetition provisions to conform to the statutory mandate of § 53–9–9 via partial enforcement. *See Ward*, 1998 SD 10, ¶ 14, 575 N.W.2d at 238 (modifying noncompetition agreement to make it enforceable in the county in which employer was located); *Loescher v. Policky*, 84 S.D. 477, 173 N.W.2d 50, 53, 55 (1969)(modifying noncompetition agreement to limit its operation to the City of Spearfish and that part of Lawrence County located within a twenty-five mile radius of the defendant's veterinary practice); *see also* Restatement (Second) of Contracts § 184(2) (1981). As noted above, this covenant seeks to encompass areas not delineated in the statute. Following precedent, then, we modify the agreement to comport with the statute by reducing the boundaries to include only those markets within the city limits of Sioux Falls, the only legal benchmark provided in the covenant. Because the agreement identified no particular county, we cannot extend the agreement beyond the city limits to include either Minnehaha or Lincoln counties in their entireties. Although not the sweeping prohibition on trade that Moyer sought, the modification prevents Simpson from competing with C & R in Sioux Falls.

6. Simpson urges us to accept a reading of the contract that would exclude C & R in the noncompetition agreement. Although the

### 4. Enforcement of Covenant as Modified

[¶ 17.] Under the modified agreement, Simpson was not in breach with respect to his operations in Tea, South Dakota. Delta Enterprises and Custom Plastics are well outside the city limits of Sioux Falls. On the other hand, Simpson seeks to enforce full payment for a noncompetition provision that he agreed would encompass a far greater area. By the terms of their agreement:

> If any [court] determination has the effect of permitting Simpson to compete with C & R in any of the area [sic] described in Section 1(b) of this Agreement, then Buyer's obligation to make the payments specified in this Agreement shall immediately cease.[6]

In accord with this provision, it having been determined that the noncompetition provision extends beyond a valid geographic area, C & R's duty to make further payments immediately ceases. Therefore, although the circuit court applied different reasoning, its grant of summary judgment dismissing Simpson's claim for the remainder of the payments was proper. However, the circuit court in finding a breach by Simpson, granted a $40,000 judgment to C & R to reimburse it for the two earlier payments it made. As the modified agreement was not breached with respect to Simpson's operations in Tea, and because the agreement is silent on any right to reimbursement if a geographic area is found invalid, the court erred in granting judgment to C & R for its previous payments. We reverse summary judgment for C & R. We remand to allow the parties to proceed on whatever cause of action remains under the modified noncompetition agreement.

[¶ 18.] Affirmed in part, reversed in part, and remanded.

facts and other covenant provisions contradict his argument, this provision plainly disposes of it.

[¶ 19.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.

